[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12319
_____

D.C. Docket No. 1:18-cr-20526-UU-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALAP SHAH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 24, 2020)

Before WILLIAM PRYOR, Chief Judge, HULL and MARCUS, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal of convictions for receiving healthcare kickback payments, 42 U.S.C. § 1320a-7b(b), requires us to decide whether an error in a jury instruction was harmless. At the request of the government, the district court instructed the jury that Dr. Alap Shah violated the statute prohibiting kickbacks if *one* reason he accepted the payment was because it was in return for writing prescriptions. In his

written briefs on appeal, Shah argued that the district court erred and should have instructed the jury that the government was required to prove that his main or only reason for accepting the payment was because it was made in return for writing prescriptions. The government defended the jury instruction as a correct statement of the law. We instructed the parties to be prepared to address at oral argument whether the text of the statute makes clear that Shah's motivation for accepting kickbacks was irrelevant. Both parties then agreed at oral argument that the jury instruction was erroneous and that the statute requires *no* proof of the defendant's motivation for accepting the illegal payment, so long as he accepts the kickback knowingly and willfully. But the parties disagreed about whether the error harmed Shah. We conclude beyond a reasonable doubt that the error caused Shah no harm because it required the government to prove even more than the statute required. We affirm.

## I. BACKGROUND

Dr. Alap Shah was a podiatrist in Columbus, Georgia. He sometimes prescribed compounded medicines to his patients. Compounded medicines are custom-formulated drugs that can vary from off-the-shelf drugs in strength, delivery method, or combinations. For example, a compounded medicine might be a cream that combines three pain-reducing drugs ordinarily produced in pill form at a lower strength than available off the shelf. Specialized pharmacies produce

2

compounded medicines, which are much more expensive than off-the-shelf prescription medications. A single tube of a compounded cream can cost $15,000 or more.

Shah and about 20 others participated in a kickback conspiracy that involved writing prescriptions for compounded drugs. Each of them faxed prescriptions for compounded drugs to a company called PGRx Group, which in turn directed a compounding pharmacy to fill the prescriptions. The pharmacy paid PGRx Group a kickback, usually around 50 percent of its profits, for each prescription PGRx Group referred to it. PGRx Group passed part of that kickback on to the prescribing doctor.

Shah received his share of the profits as a flat monthly payment of $5,000, and some other doctors received a percent commission from the prescriptions they wrote. PGRx Group disguised the nature of the payments by hiring the doctors to be "medical directors," by calling the payments speaker fees for promoting PGRx Group and compounded drugs at professional events, and by routing payments to the prescribing doctors' family members or employees.

Shah joined the conspiracy in May 2014 after being recruited by its masterminds, Paul Meek and Gary Small. Meek and Small invited Shah to be a medical director for PGRx Group. They offered him $5,000 each month for his

3

participation, and they sent him a contract that explained his duties as a medical director.

Shah corrected a typo in the contract before signing it. The contract provided Shah's duties as a medical director included performing on-site supervision and training, management, and administrative responsibilities. And the contract required PGRx Group to provide Shah with office space in its facility.

Shah performed none of his duties under the contract. Far from providing on-site supervision and training, he did not even know where PGRx Group was located. And PGRx Group never provided him with office space. But even so, PGRx Group always paid Shah $5,000 a month.

After seven months, PGRx Group told Shah he would receive the same payments under a new contract. The new contract required Shah to promote PGRx Group as a speaker. Shah promoted PGRx Group no more than a handful of times, but he continued receiving his payments of $5,000 each month.

Shah prescribed compounded medications far more often after he signed the contracts with PGRx Group than before he signed the contract. For example, in a six-month period before the conspiracy began—from August 2013 to February 2014—Shah wrote 26 prescriptions for compounded medications. But in a six-month period during the conspiracy—from August 2014 to February 2015—he

4

wrote 209 prescriptions for compounded medications. At trial, Shah nevertheless insisted that he never wrote a prescription that a patient did not need.

Frequent text messages and emails between Shah and his cohorts, Meek and Small, showed that the medical director and speaker contracts were a sham. At one point, Meek wrote to Shah, "If we can get five to ten scripts a day from you, I believe then we will be good to go." Shah answered, "I will do what I can." Another time, Shah warned Small, "I will be on vacation this week, so you may see a drop off in numbers. FYI: Will pick up starting week 4/6 again." Meek and Small both asked Shah about a dropoff in prescriptions during July 2014. Small wrote, "Our records indicat[e] only three scripts sent for the month of July. If this sounds incorrect on your side, please resend if you have time." Shah responded, "I will look into it[.]" And Meek wrote: "I'm checking in as I have not seen any scripts for the month of July. Am I looking at the wrong line?" Shah responded, "I was out of town until 7/7 but wrote all last week and this. Are you sure?"

They also corresponded about insurance coverage and reimbursement rates for different drugs. Tricare, a federal program for members of the military and their families, paid for many of the prescriptions Shah wrote. It reimbursed at a higher rate than other insurance companies. Shah texted Small at one point to say that he "got two TRICAREs" that he "want[ed] to give" Meek and Small. Another time, Shah wrote, "Need script for wellness vitamins. Don't have. Heard TRICARE pays

well." Near the end of the conspiracy, when Tricare stopped reimbursing as generously for compounded medications, Shah texted Small to ask why he wasn't being paid. Small responded in detail: "We are getting a few hundred dollars per script on the PPO and Medicare. The TRICARE is being tested now possibly over $10,000 a script and we will know soon." Shah also offered to change his prescription practices. He wrote to Small, "I can push cream instead. Thought patches might be good pay." Small replied, "Patches pay a little bit less than the creams."

Shah continued in this role until around May 2015, when Tricare made the conspiracy less profitable by instituting a prior-authorization requirement for compounded drugs. All told, he received checks from PGRx Group totaling $55,350.43. The prescriptions he wrote during the conspiracy cost Tricare more than a million dollars.

A grand jury charged Shah with one count of conspiring to receive kickbacks for writing prescriptions or to defraud the government and three counts of receiving kickbacks for writing prescriptions—one count each for kickbacks in July, August, and September 2014. 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)(1)(B). Shah pleaded not guilty, and the case went to trial.

Over Shah's objection, the government asked the judge to instruct the jury that "the government must only prove that inducing the [writing of prescriptions]

was one of the Defendant's purposes in soliciting or receiving the remuneration or kickback." The district court decided to give an instruction similar to the one requested: Shah was guilty if "obtaining payment in return for [writing prescriptions] was one of [his] purposes in soliciting or receiving the remuneration or kickback." That instruction read as follows:

> To satisfy the second element of this offense, the Government does not have to prove that the defendant's sole purpose in soliciting or receiving the remuneration or kickback was to obtain payment in return for the purchasing, leasing, ordering and arranging for, and recommending purchasing, leasing and ordering. Rather, the Government must only prove that obtaining payment in return for the purchasing, ordering or leasing was one of the defendant's purposes in soliciting or receiving the remuneration or kickback.

The district court also instructed the jury that the government must prove that Shah accepted the payments knowingly and willfully and that he committed no crime if he accepted the payments in good faith.

Shah's closing argument focused on *mens rea* and the good-faith defense. He began by telling the jury that "[t]he case is about whether Dr. Shah acted willfully." "That's the key," he reiterated. He summarized evidence showing that Shah thought the scheme was legal. And he concluded the argument by reminding the jury that it was obligated to acquit Shah "if he thought [the scheme] was legal." "That's the promise of America," he told them. "That's the promise that you made when you were sworn in as a juror."

7

The jury convicted Shah of count one, conspiring to receive health care kickbacks or defraud the United States, and counts three and four, receiving kickbacks in August and September. It acquitted him on count two, receiving a kickback in July. The district court sentenced him to 36 months of incarceration on each count, to run concurrently, and ordered him to pay $55,340 in restitution.

## II. STANDARD OF REVIEW

"We review de novo the legal correctness of a jury instruction . . . ." *United States v. Melgen*, 967 F.3d 1250, 1259 (11th Cir. 2020). "[A]n improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee." *Neder v. United States*, 527 U.S. 1, 12 (1999). But a constitutional error is harmless if "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 60–61 (2008).

## III. DISCUSSION

After we posed written questions to them, both parties conceded at oral argument that the jury instruction was erroneous because the statute does not require proof of the defendant's motivation for accepting the payment. Because Shah, the government, and the American Medical Association as *amicus curiae* argued in their briefs that the statute requires proof of either partial or primary

8

motive, we first explain why the parties' later concession was correct. We then address whether the error was harmless.

The statute of conviction says nothing about the defendant's motivation for accepting the payment. The statute instead reads as follows:

> (b) Illegal remunerations
>> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>> . . .
>>> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b). The next subsection uses nearly parallel terms to prohibit the other side of the coin: No one may "knowingly and willfully offer[] or pay[] any remuneration . . . to any person to induce such person" to cause the purchase of something paid by a federal healthcare program. *Id.* § 1320a-7b(b)(2).

The text does not require proof of a defendant's "purposes in soliciting or receiving" a payment. The statute's key phrase—"remuneration . . . in return for [writing Tricare prescriptions]"—says nothing about the reasons *the defendant* accepted the payment. Instead, the words "in return for" are an adjectival prepositional phrase describing *the payment*. *See* Chicago Manual of Style § 5.176

9

(2017). And there is no reason to stretch that phrase into a description of the defendant's mental state.

We sometimes "read a state-of-mind component into an offense" when the statute lacks an express mens rea requirement. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 437 (1978). But we need not do so here because Congress specified the necessary mental state a few words earlier: The defendant must accept the payment "knowingly and willfully." 42 U.S.C. § 1320a-7b(b)(1). So the parties are correct to concede that the crime requires no proof of the defendant's motivation for accepting the payment.

A similar statute that uses the phrase "in return for" supports this reading. A federal bribery statute contains the following prohibition:

> [No] public official, . . . directly or indirectly, [shall] corruptly demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value personally or for any other person or entity, *in return for* . . . being influenced in the performance of any official act . . . .

18 U.S.C. § 201(b)(2) (emphasis added). Some public officials prosecuted under this statute argued that they were not guilty because they received payments in exchange for a promise to perform an official action, but they did not actually intend to perform that action. But the courts faced with those arguments decided that the statute extended to their false promises because "[t]he phrase 'in return for' brings into play the purpose of the bribe," not the defendant's motivation for accepting it. *United States v. Myers*, 692 F.2d 823, 840–42 (2d Cir. 1982)

10

(alteration adopted); *accord United States v. Peleti*, 576 F.3d 377, 382–83 (7th Cir. 2009). Our pattern jury instruction for receipt of a bribe by a public official adopts this view that the recipient of the payment need not intend to perform his end of the bargain. Eleventh Circuit Pattern Jury Instructions (Criminal Cases) Offense Instruction 5.2 (2020) ("It is not necessary that the public official *actually* make a decision or take an action . . . . Nor must the public official in fact intend to perform the official act . . . ."). And it explains the necessary mental state without looking to the defendant's motivation for accepting the bribe. *Id.* ("To act 'corruptly' means to act knowingly and dishonestly for a wrongful purpose."). In the same way, the phrase "in return for" in section 1320a-7b(b) speaks to the nature of the payment, not Shah's reasons for accepting it.

Our decision creates no tension with other circuits' precedents interpreting the statute. None of our sister circuits' opinions addressing the payee crime decided the question raised by the parties' briefs. *See United States v. Borrasi*, 639 F.3d 774, 776 (7th Cir. 2011); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29–30 (1st Cir. 1989); *United States v. Kats*, 871 F.2d 105, 106, 108 (9th Cir. 1989); *United States v. Porter*, 591 F.2d 1048, 1050, 1054 (5th Cir. 1979). And we agree with our sister circuits that the *payor* crime, which prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration . . . to induce" the same set of enumerated activities, prohibits payments that are

11

meant *by the payor* to induce one of the enumerated actions. 42 U.S.C. § 1320a-7b(b)(2); *see United States v. McClatchey*, 217 F.3d 823, 828, 834–35 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. Greber*, 760 F.2d 68, 69–70 (3d Cir. 1985). So motive matters for the payor crime even though it does not for the payee crime.

The district court erred by instructing the jury that the government had to prove Shah accepted the payments at least in part because they were made in return for the prescriptions he wrote. No such proof was required. But the government has met its burden of proving beyond a reasonable doubt that the error did not harm Shah. The erroneous instruction required the government to prove more than the statute required, so if anything, the error worked to Shah's advantage.

Shah argues that the error harmed him because it relaxed the government's burden to prove willfulness; instead of proving that he accepted the payments willfully, he says, the government could argue that Shah broke the law if only one of his reasons for accepting the payment was that it was made in return for the prescriptions he wrote. And he says the government took advantage of this possibility when it repeatedly focused on the "one purpose" instruction in its opening statement and closing argument.

We disagree. The district court correctly instructed the jury about the burden the government bore in proving willfulness. And it correctly instructed the jury that

12

Shah committed no crime if he accepted the payments in good faith. And Shah's own closing argument focused on the mens rea requirements and the good-faith instruction. We see no reason why adding an unnecessary "one purpose" instruction could have prejudiced Shah by detracting from the otherwise correct willfulness and good-faith instructions. In the absence of any prejudice to Shah, we affirm. *See, e.g.*, *United States v. House*, 684 F.3d 1173, 1206 (11th Cir. 2012).

## IV. CONCLUSION

We **AFFIRM** Shah's conviction.