**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-13674

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JOHN DAVID MELTON,

a.k.a. David Melton,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:20-cr-00081-RSB-BKE-4

_____

Before ROSENBAUM, GRANT, and MARCUS, Circuit Judges.

PER CURIAM:

John David Melton ("David") appeals his conviction for conspiracy to violate the Sherman Act arising out of his involvement

in the ready-mix concrete industry.  Ready-mix concrete is a product made on demand and used in construction projects.  Due to transportation costs and its perishable nature, concrete firms have "restricted geographic marketing areas" around individual production plants.  The indictment charged several concrete companies and their representatives -- including Greg Melton ("Greg"), a division manager for the Argos company; James Pedrick, a cement salesman for Argos; the appellant David, the general manager for Elite Concrete, a competitor of Argos; and the Evans Concrete company and Timothy Strickland -- with participating in a conspiracy to coordinate price increases, rig bids, and allocate jobs in their local ready-mix concrete industry in the Southern District of Georgia.  After a four-day trial, the jury found David guilty of the conspiracy count.  He was sentenced to 26 months' imprisonment, followed by three years of supervised release.

On appeal, David argues that the district court: (1) erred by denying his motion for a judgment of acquittal after the close of the government's evidence because the evidence was insufficient to establish that he was part of an agreement to fix prices, rig bids, or allocate markets; (2) abused its discretion by denying his motion for a new trial based on the prejudicially harmful testimony from two sales people (Argos salesman Pedrick and former Argos employee, Chris Young) that -- based on their corporate antitrust training -- David and his co-defendants engaged in "illegal" conduct; and (3) erred by denying David's motion to dismiss the indictment based on the grand jury being improperly comprised during the COVID-19 pandemic.  After careful review, we affirm.

## I.

We review de novo a district court's order denying a motion for a judgment of acquittal based on sufficiency of the evidence. *United States v. Pirela Pirela*, 809 F.3d 1195, 1198 (11th Cir. 2015). We review a district court's denial of a motion for a new trial under Rule 33 for abuse of discretion. *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). We also review a district court's denial of a motion to dismiss an indictment as a violation of the Fifth Amendment and Federal Rule of Criminal Procedure 6 for abuse of discretion, reviewing issues of law de novo. *United States v. Graham*, 80 F.4th 1314, 1317–19 (11th Cir. 2023).

## II.

First, we are unpersuaded by David's claim that the district court erred by denying his motion for a judgment of acquittal. In reviewing the sufficiency of the evidence, we view the record in the light most favorable to the government and resolve all reasonable inferences in favor of the verdict. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). The evidence is sufficient if a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *Id*. at 1284–85. The test for sufficiency is the same, no matter if the evidence is direct or circumstantial; but where the government relied on circumstantial evidence, reasonable inferences must support the conviction. *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015). The evidence need not exclude every reasonable hypothesis of innocence for a reasonable jury to find guilt beyond a reasonable doubt. *United States v. Bell*, 112 F.4th

1318, 1331 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025).  "A guilty verdict in a multi-object conspiracy will be upheld if the evidence is sufficient to support a conviction of any of the alleged objects."  *United States v. Ross*, 131 F.3d 970, 984 (11th Cir. 1997).

Section 1 of the Sherman Act bars "[e]very . . . conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.  "[I]n view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'"  *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (citation modified).  "Restraints can be unreasonable in one of two ways."  *Id.*  "Typically only horizontal restraints -- restraints imposed by agreement between competitors -- qualify as unreasonable per se."  *Id.* at 540–41 (citation modified). These include agreements among competitors to fix prices, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940), to rig bids, *United States v. Dynalectric Co.*, 859 F.2d 1559, 1574 n.19 (11th Cir. 1988), or to allocate markets, *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990).  Bid rigging, or "[a]n agreement that one company would not submit a bid lower than another[,] is price fixing of the simplest kind and is a per se violation."  *United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977).[1]  Meanwhile, market allocation is an agreement among competitors to divide territories, customers, or contracts.  *Palmer*, 498 U.S. at 49–50 (territories); *United States v.*

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

*Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088 (5th Cir. 1978) (customers); *Flom*, 558 F.2d at 1183 (contracts).

Per se illegal restraints are "so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances." *NYNEX Corp., v. Discon, Inc.*, 525 U.S. 128, 133 (1998). Thus, for cases involving per se illegal restraints, "[t]he only inquiry in such cases is whether there was an agreement to do so, because the unreasonableness of the restraint is presumed." *Levine v. Centr. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1546 (11th Cir. 1996). "A § 1 agreement may be found when the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful agreement." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (citation modified). Section 1 of the Sherman Act "does not reach conduct that is wholly unilateral." *Id.* at 768 (citation modified) (reviewing claims concerning a company's internal coordination as opposed to coordination amongst competitors).

For price fixing, "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *Socony-Vacuum*, 310 U.S. at 223. However, "[t]he exchange of price information among competitors is not a per se violation of the antitrust laws." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1505 (11th Cir. 1985). "Absent an agreement to fix prices, there is nothing unlawful about competitors meeting and

exchanging price information or discussing problems common in their industry, or even exchanging information as to the cost of their product." *Id.* (citation modified). A jury may infer price fixing from evidence of an exchange of price information. *See United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 681 (5th Cir. 1981) (affirming where the government had "presented direct evidence of price fixing as well as evidence of an exchange of price information from which the jury could infer price fixing" and finding that "reasonable persons could conclude beyond a reasonable doubt that a conspiracy . . . existed and that appellants knowingly and willingly participated in the conspiracy" from such evidence).

Here, the district court did not err by denying David's motion for a judgment of acquittal on his Sherman Act conspiracy conviction. As the record reflects, a reasonable jury could have found beyond a reasonable doubt that David participated in an agreement to fix prices, rig bids, or allocate markets based on evidence that he provided information to competitors for annual price increase letters for the purpose of raising prices, discussed specific bids with competitors so that competitors made non-competitive bids, and divided market areas and customers between competitors.

For starters, there was evidence that David's brother Greg, manager at Argos, another concrete company, said he wanted to discuss -- and did discuss -- the pricing for certain jobs with David, who worked at Elite Concrete, and that Greg was aware that price increase letters were being taken to competitors before their re-

lease to coordinate prices.  Indeed, Argos salesman Pedrick testified, corroborated by contemporaneous audio records and documents, that David gave him price information to pass on to Greg and others and received pricing information from David in order to craft the price increase letters.  Further, Pedrick and former Argos employee Young testified extensively that Pedrick would convey bids for jobs and planned price increases between David and others for the goal of increasing prices, either on specific jobs or for the annual price increase letters each company provided to customers.  So, for example, Young testified, corroborated by audio recordings, that before Greg told Young how to price a particular job, Greg reached out to David; after talking with David and learning that David would be pricing at $80, Greg directed Young to submit a bid of $82; and Greg himself explained this directive by telling Young that Greg had "told [David] . . . we'd stay above [David's quote]."  Young and Pedrick also testified about "divvying up" market shares in particular market areas, customers, and contracts.  In one instance, Young testified that Greg at Argos said he wanted *David at Elite* to get 75 percent of VB Construction's work, and that, thereafter, Elite shipped the concrete for many of VB Construction's jobs, even though Young had won them for Argos.  From this evidence, a reasonable jury could have found beyond a reasonable doubt that David was a willing participant in the scheme to fix prices, rig bids, and allocate markets.

As for David's claim that there was no evidence that *he* was instructed to make particular bids on jobs, our case law is clear that

evidence need not exclude every reasonable hypothesis of innocence for a reasonable jury to find guilt beyond a reasonable doubt. *See Bell*, 112 F.4th at 1331. Similarly, as for David's argument that the price increase letters did not reflect an agreement but rather only showed legally permissible information sharing, we remain unpersuaded. While "[t]he exchange of price information among competitors is not a per se violation of the antitrust laws," testimony from former Argos employee Young and Argos salesman Pedrick established that the information exchange of price increase letters prior to distribution to customers was part of an agreement with the express purpose of raising prices. *Amey, Inc.*, 758 F.2d at 1505. Further, a jury may infer price fixing from evidence of an exchange of price information -- just as the testimony we've detailed from Young and Pedrick indicates here. *See Cargo Serv. Stations, Inc.*, 657 F.2d at 681. All in all, there was more than sufficient evidence for a reasonable jury to find beyond a reasonable doubt that the defendant knowingly and intentionally engaged in price fixing, bid rigging, and/or market allocation to sustain a conviction for conspiracy to violate the Sherman Act. *See Ross*, 131 F.3d at 984.

## III.

We are also unconvinced by David's argument that the district court abused its discretion by denying his motion for a new trial. A district court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a new trial based on an error in admitting statements only if "a significant possibility . . . exist[s] that, considering the other evidence

presented by both the prosecution and the defense, the state-ment[s] had a substantial impact upon the verdict of the jury." *United States v. Arbolaez*, 450 F.3d 1283, 1290 (11th Cir. 2006) (cita-tion modified), *abrogated in part on other grounds by, Michigan v. Bry-ant*, 562 U.S. 344, 355 (2011).

Evidence is relevant if it has "any tendency" to make "more or less probable" a "fact [that] is of consequence in determining the action." Fed. R. Evid. 401. To be "of consequence," a fact need only be a "step on one evidentiary route to the ultimate fact." *Old Chief v. United States*, 519 U.S. 172, 178–79 (1997). Relevant evi-dence is generally admissible. *United States v. Gbenedio*, 95 F.4th 1319, 1330 (11th Cir. 2024). "The standard for what constitutes rel-evant evidence is a low one." *United States v. Macrina*, 109 F.4th 1341, 1349 (11th Cir. 2024) (citation modified).

"If the district court issued a curative instruction, [we] will reverse only if the evidence is so highly prejudicial as to be incura-ble." *United States v. Melgen*, 967 F.3d 1250, 1262 (11th Cir. 2020) (citation modified). We "presume that jurors follow the instruc-tions given by the district court." *United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011).

Here, the district court did not abuse its discretion in deny-ing David's motion for a new trial. David claims that Young and Pedrick testified that -- based on their corporate antitrust training -- the defendants engaged in "illegal" conduct and that the district court erred in determining that this characterization was not im-proper nor harmful. But the record shows, instead, that Young and

Pedrick testified as to their corporate training in order to establish their impression of David's and others' actions and to provide context for their own actions over the course of the investigation. So, for example, they testified about their corporate training to explain why they were concerned about certain conduct by Greg and David and why they had recorded certain conversations, or why they had acted as go-betweens between the brothers and others. In addition, Young's and Pedrick's testimony was particularly relevant since David attacked Young's and Pedrick's motivations as witnesses on cross-examination. *Macrina*, 109 F.4th at 1349.

Regardless, any prejudicial effect of the testimony was cured by the district court's repeated admonition to the jury that Young's and Pedrick's testimony was to be considered only as to their understanding and not as an articulation of the law, which only the district court could provide to the jury in its instructions. We "presume that jurors follow the instructions given by the district court," and David has not identified anything in the record to overcome that presumption or to establish that such testimony was "so highly prejudicial as to be incurable." *Melgen*, 967 F.3d at 1262; *Almanzar*, 634 F.3d at 1222.

## IV.

Finally, we find no merit to David's claim that the district court abused its discretion in denying his motion to dismiss his indictment as a violation of the Fifth Amendment and Federal Rule of Criminal Procedure 6. Indeed, in *Graham*, we determined that a district court did not abuse its discretion by denying a motion to

dismiss an indictment as a violation of the Fifth Amendment and Rule 6 because nothing in the COVID-19 pandemic protocols that allowed grand juries to convene and vote from three secure locations via videoconference changed the basic nature of the grand jury or fatally infected the defendant's indictment. 80 F.4th at 1317–19. David concedes that his argument -- alleging a violation of the Fifth Amendment and Rule 6 when the grand jury convened and voted under the district court's standing order during the COVID-19 pandemic -- is foreclosed by *Graham*.

**AFFIRMED.**